IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BLUE LAKE RANCHERIA and BLUE LAKE RANCHERIA ECONOMIC DEVELOPMENT CORPORATION, | ) ) ) | Case No. 08-4206 SC |
| | ) | ORDER RE: CROSS-MOTIONS FOR |
| Plaintiffs, | ) ) | <u>SUMMARY JUDGMENT</u> |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## I.   <u>INTRODUCTION</u>

Plaintiffs Blue Lake Rancheria and Blue Lake Rancheria Economic Development Corporation ("Plaintiffs") filed this suit for a refund of federal unemployment taxes paid on behalf of Mainstay Business Solutions ("Mainstay"), which is an unincorporated enterprise of the Blue Lake Rancheria Indian Tribe. Compl., Docket No. 1. Defendant United States of America ("United States") has denied Plaintiffs' previous request for a tax refund. <u>Id.</u> ¶ 6.

Plaintiffs and the United States have both filed cross-motions for summary judgment. Docket Nos. 26 ("US MSJ"), 27 ("Pls.' MSJ"). Both motions have been fully briefed. Docket Nos. 40 ("US Opp'n"), 41 ("Pls.' Opp'n"), 45 ("Pls.' Reply"), 48 ("US Reply"). Having considered all of the briefing, the Court concludes that the matter is appropriate for decision without oral argument. For the reasons

stated below, the Court GRANTS the United States' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment.

## II.  BACKGROUND

### A.  Overview of Federal Unemployment Taxes

Under the Federal Unemployment Tax Act ("FUTA"), there is "imposed on every employer . . . for each calendar year an excise tax, with respect to having individuals in his employ, equal to . . . . 6.2 percent . . . of the total wages . . . paid by him during the calendar year."  26 U.S.C. § 3301.[1]  The term "total wages" can be somewhat misleading, since FUTA exempts from its definition of "wages" all payment to a single employee in excess of $7000.  See id. § 3306(b)(1).  This effectively caps the wages relevant for calculating FUTA liability at $7000 per employee.

The scheme set down by FUTA is not purely federal in nature; rather, the statute is part of a joint federal-state unemployment insurance program.  See Inlandboatmen's Union of Pac. Nat'l Health Benefit Trust v. United States, 972 F.2d 258, 259 (9th Cir. 1992). "Prior to 1935, very few states had enacted unemployment compensation schemes.  Absent federal encouragement, states had been reluctant to impose an unemployment tax for fear of placing themselves at a competitive disadvantage with respect to business interests."  Id. (citing Steward Machine Co. v. Davis, 301 U.S. 548, 588 (1936)).  To this end, FUTA encourages states to create their own unemployment insurance funds, and allows taxpayers to

_____

[1] Unless otherwise noted, all statutory citations are to the Internal Revenue Code ("IRC"), Title 26 of the United States Code.

credit the amount of contributions paid to the state fund against the 6.2% federal tax imposed by FUTA. See 26 U.S.C. §§ 3302-03.[2] The ceiling for this credit is capped, and the applicable cap in this case was set so as to reduce the amount of federal unemployment taxes to no less than 0.8% of the "total wages" for each person in Mainstay's employ. See id. § 3302(b); Pls.' MSJ at 4; US Reply at 12 n.5.

Section 3306(c) provides an exception to the definition of "employment" for the purposes of FUTA taxes, such that services performed "in the employ of a State, or any political subdivision thereof," are not considered "employment" for the purpose of calculating wages or determining liability under FUTA. 26 U.S.C. § 3306(c)(7). In 2000, this provision was amended to extend the exception to include "service performed . . . in the employ of an Indian tribe, or any instrumentality" thereof. Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 166(a), (d), 114 Stat. 2763, 2763A-627 (2000). The clear purpose of this amendment was to exempt Indian tribes from FUTA liability to the same extent as state governments. See H.R. Conf. Rep. 106-1033, p.*1000 (2000) ("[A]n Indian tribe (including any subdivision, subsidiary, or business enterprise chartered and wholly owned by an Indian tribe) is treated like a non-profit organization or State or local government for FUTA purposes (i.e., given an election to choose the

---

[2] Section 3302(b) also provides for an "additional credit," if an employer is entitled to pay less than the maximum amount due for state unemployment taxes, equal to the difference between the amount actually paid and the maximum amount chargeable by the state. 26 U.S.C. § 3302(b). This allows the states to create incentives for employers, by charging certain employers lower state unemployment taxes without those tax cuts being countervailed by higher federal unemployment taxes.

1   reimbursement treatment).").[3]  This amendment allowed Indian

2   tribes, like government employers, to elect "to pay (in lieu of

3   [regular state unemployment taxes]) into the State unemployment

4   fund amounts equal to the amounts of compensation attributable

5   under the State law to such service." 26 U.S.C. § 3309.  In other

6   words, FUTA not only exempts Indian tribes from federal

7   unemployment tax liability, but also requires states to give each

8   Indian tribe a chance to opt out of paying state unemployment

9   taxes, so long as the Indian tribe elects to reimburse the state

10  for the actual costs of providing unemployment benefits to its own

11  employees (the "reimbursement method").

12      **B.   Overview of Mainstay's Business**

13      Blue Lake Rancheria is a federally recognized Indian tribe,

14  located primarily in Blue Lake, California.  Compl. ¶ 1.  It

15  consists of about fifty-three members.  See Green Decl. Ex A ("Blue

16  Lake Rancheria Website").[4]  According to Plaintiffs, in May of 2003

---

18  [3] Plaintiffs have submitted a Request for Judicial Notice, Docket
    No. 33, which includes three documents that demonstrate that the
19  2000 amendment "intended the exemption of tribes from FUTA tax to
    further the long-held federal goal of promoting tribal economic
20  development and self-sufficiency," Pls.' MSJ at 5.  These documents
    are relevant as background, however they are not probative of the
21  issue at hand, i.e., the intended scope of the FUTA exemption as to
    state governments or Indian tribes.  Although the Court DENIES
22  Plaintiffs' Request for Judicial Notice, it notes that the message
    of the attached documents -- that Congress intended by this
23  amendment to assist Indian tribes -- is evident on the face of the
    statute.  This denial therefore does not affect the outcome of this
24  Order.
    [4] Phyllis Green ("Green"), Internal Revenue Agent, submitted a
25  declaration in support of the US MSJ.  Docket No. 27.  Plaintiffs
    have objected to much of this declaration, including the attached
26  printout of the Blue Lake Rancheria Website, on the basis that
    Green has not established personal knowledge of the facts
27  represented therein.  Docket No. 43.  The Court OVERRULES
    Plaintiffs' objection with respect to this website, and takes
28  judicial notice of this document.  Because these facts are not
    subject to reasonable dispute, and are capable of determination

4

**United States District Court**
For the Northern District of California

the tribe established Mainstay Business Solutions ("Mainstay"), which operates as "an employee staffing organization." Id. Since 2006, Mainstay has been under the control of the Blue Lake Rancheria Economic Development Corporation, a tribal corporation, and Plaintiffs contend that Mainstay continues to operate as a subdivision or instrumentality of the tribe. Id. ¶¶ 1-2. Since its establishment in 2003, Mainstay "experienced explosive growth." Hansen Decl. ¶ 4.[5] Plaintiffs claim that, during 2003 and 2004, Mainstay was responsible for paying the wages of approximately 39,000 employees located in three states. Compl., ¶¶ 8-9.

According to Plaintiffs, Mainstay's business involves providing temporary and permanent employee staffing services to small and medium-sized businesses, primarily in the state of California. Id. ¶ 2. In order to do this, "Mainstay entered into a Standard Customer Agreement with each of its clients, and hired the client's employees as its own." Id. In effect, Mainstay then leased those employees back to its client, while maintaining payroll and other responsibilities related to human resource management. See Pls.' MSJ at 6. It also operated as a temporary staffing company, whereby "Mainstay entered into a Third Party Agreement with the temporary staffing agency, and hired its own employees the 'temps' referred by the agency to its own clients." Hansen Decl. ¶ 2. Most (70-75%) of the individuals that Mainstay

---

using sources whose accuracy cannot reasonably be questioned, judicial notice is appropriate. See New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of data on web sites of federal agencies). The Court finds the website, which purports to be maintained by the tribe itself, to be reliable.
[5] Michael Hansen ("Hansen"), CEO of Mainstay during 2003 and 2004, submitted a declaration in support of Plaintiffs' Motion for Summary Judgment. Docket No. 31.

so employed were from the leasing side of its business.  Id. ¶ 3.

When Mainstay signed a contract with new clients, it would send a Human Resource Manager ("HRM") to its clients' work sites to meet "with the employees in groups and individually to inform them that Mainstay would be their new employer, to review Mainstay's employment policies, . . . and to ensure that all Mainstay new hire paperwork was filled out by each employee . . . ." Sparks Decl. ¶ 3.[6] The employees were told that "their daily work activities would be directed by supervisors at the worksite, and their wages, benefits, employment rules and related policies would be directed by Mainstay." Id. ¶ 4.  The HRM would also meet with the client and its managers and supervisors (some of whom were also becoming Mainstay employees). Id. ¶ 3.  Mainstay told its clients that "[t]he goal of the working relationship between our two companies is to relieve you of these time consuming hassles so you can concentrate on your real job, managing your business." Sparks Decl. Ex. 2 ("Management Guide") at 4.

While Mainstay would integrate itself "into areas involving employee services, [the clients'] employees still work for [the clients'] company and [the clients] still direct their day-to-day activities in the workplace." Id. at 4.  Mainstay's Employee Handbook reflected that the employees' "day-to-day job duties, hours and activities will be directed and supervised by management at your worksite company." Sparks Decl. Ex. 1 ("Employee Handbook") at 5.  The clients were required to "furnish Mainstay with employee job descriptions, written notice of any material

---

[6] Anne Sparks ("Sparks"), Director of Client Services for Mainstay, submitted a declaration in support of Plaintiffs' Motion for Summary Judgment.  Docket No. 32.

change in an employee's assignment, and employee time cards."
Hansen Decl. ¶ 3.  Mainstay would invoice its clients for the
employees' wages, although Mainstay would pay the employees whether
the clients paid the invoices or not.  Id. ¶¶ 13-14.

After Mainstay had hired its clients' previous employees, the
employees would be paid through Mainstay's payroll, and Mainstay
would provide the employees with worker's compensation insurance
and employee benefits, and would provide its clients with
assistance in complying with applicable local, state and federal
employment laws.  Hansen Decl. ¶ 3.  Pursuant to its various
Standard Customer Agreement Forms, "Mainstay maintained the right
to recruit, screen and hire employees for assignment at its
clients' businesses; maintained responsibility for terminating
employees, and maintained the right to determine and set the level
of pay and fringe benefits for employees."  Id. ¶ 5, Exs. 1, 2, 3
(collectively, "Standard Customer Agreements").  Mainstay would
maintain personnel files and payroll records, withhold and report
taxes, and issue W-2 forms to the employees.  Hansen Decl. ¶ 5;
Standard Customer Agreements.  The clients would be unable to alter
the compensation or benefits of the employees without Mainstay's
"express written agreement."  See Standard Customer Agreements.
Under the terms of the contracts, clients could decide that they no
longer wished to "accept the service of any particular Mainstay
solutions employee," at which point they would notify Mainstay.[7]
Id.  Similarly, Mainstay directed its clients to seek approval from

_____

[7] Upon the involuntary termination of an employee, Mainstay claims
that it would "attempt to place that employee with a leasing or
temporary staffing agency client in the local community," Hansen
Decl. ¶ 7, however "Mainstay did not attempt to place individuals
terminated for misconduct or absenteeism," Sparks Decl. ¶ 16.

Mainstay before they hired job applicants, although the responsibility for interviewing the employees apparently fell upon the clients' management. <u>See</u> Management Guide at 6-7.

### C. **Mainstay's Tax Liabilities**

During the years 2003 and 2004, Mainstay fully paid the amount due for its federal FUTA taxes, and did not assert immunity as an Indian tribe "[b]ecause Mainstay's exempt status . . . had not been fully resolved . . . ." Hansen Decl. ¶ 17. Mainstay is now seeking a refund for the federal unemployment taxes that it paid during this period. During the year 2003, it paid $722,047 in federal unemployment taxes; in 2004 this figure rose to $1,283,892, for a total of $2,005,939 over this two-year period. Strouse Decl. ¶¶ 2-3, Exs. 1, 2.[8]

During 2003 and 2004, Mainstay did not initially pay for its liabilities for state unemployment taxes through the reimbursement method, and instead paid state unemployment taxes just as a nontribal taxpayer would pay. <u>Id.</u> Ex. 3 ("ALJ Order") at 2. In 2005, an administrative law judge ("ALJ") for the California Unemployment Insurance Appeals Board issued a decision that allowed Mainstay to use the reimbursement method to cover its liabilities for the state portions of its unemployment taxes. The ALJ stated that, under California Law, Mainstay "is a temporary staffing agency." <u>Id.</u> at 3. Under section 605 of the California Unemployment Insurance Code ("CUIC"), an employee of a temporary staffing agency is considered the employee of that agency for the purposes of the CUIC, even though the employee's work was performed

---

[8] Jonathan Strouse ("Strouse"), counsel for Plaintiffs, submitted a declaration in support of Plaintiffs' Motion to Dismiss. Docket No. 29.

**United States District Court**
For the Northern District of California

for the agency's client, regardless of "the common law rules applicable in determining the employer-employee relationship . . . ." CUIC § 606.5(a), (c). The ALJ reasoned that "[a]lthough the actual services of Mainstay Business Solutions employees are services of individuals that work for third-party customers, they are employees of Mainstay under section 606.5 of the [CUIC], and the primary operation of Mainstay Business Solutions was for the benefit of Blue Lake Rancheria." ALJ Order at 6-7. The ALJ also reasoned that because Mainstay's revenues were used for tribal purposes, Mainstay "is performing services for the benefit of Blue Lake Rancheria as well as Mainstay." Id. at 7. Mainstay may therefore elect to pay for its state unemployment tax liabilities as an Indian tribe, through the reimbursement method.

III. **LEGAL STANDARD**

A. **Summary Judgment**

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure may be granted where the pleadings and materials on file show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A moving party that will have the burden of proof on an issue at trial must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Where the nonmoving party will have the burden of proof at trial, the moving party "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. If the moving party fails to persuade the court that

there is no genuine issue of material fact, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). However, if the moving party meets its initial burden, then the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. Id.

### B.   **Burden of Proof**

"In a refund suit, the taxpayer bears the burden of proving both the error in the assessment and the amount of refund to which he is entitled." Brown v. United States, 890 F.2d 1329, 1334 (5th Cir. 1989); see also American Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000) (rejecting plaintiff's argument in refund suit that United States had burden of proof; listing cases). "Because the government will not have the burden of proof on [the plaintiff's] refund claim, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support it. Once the government does so, [the plaintiff] must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial." Cooper v. United States, 513 F. Supp. 2d 747, 751 (N.D. Tex. 2007) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986)).

### C.   **Statutory Interpretation**

Although state and local statutes related to taxation "are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit," Yakima v. Confederated Tribes, 502 U.S. 251, 269 (1992), the Ninth Circuit has recognized that "there is a different standard for exemptions from federal

taxation," <u>Ramsey v. United States</u>, 302 F.3d 1074, 1078 (9th Cir. 2002). "The different standards stem from the state and federal government's distinct relationships with Indian tribes. . . . For this reason, all citizens, including Indians, are subject to federal taxation unless expressly exempted." <u>Id.</u> (citations omitted). Where language exists to support an express exemption, the Court must "consider whether it could be 'reasonably construed' to support the claimed exemption." <u>Id.</u> (citing <u>Hoptowit v. Commissioner</u>, 709 F.2d 564, 566 (9th Cir. 1983)).

## IV.  DISCUSSION

     The outcome of this case turns on whether those Mainstay employees whom it leases to its clients ("Leased Employees" or "LEs") should be considered "in the employ" of Mainstay for the purpose of reading the tribal exception to FUTA, 26 U.S.C. § 3306(c)(7).  The United States contends that the exception will only apply where a tribal body is the common law employer of employees at issue.  <u>See</u> US MSJ at 17.  The United States argues that Mainstay is liable not as the common law employer of the LEs, but instead as a "statutory employer," i.e., the entity that is not the recipient of an employee's services, but which has control of the payment of an employee's wages, as recognized in a related provision of the IRC.  <u>See</u> <u>id.</u>; 26 U.S.C. § 3401(d)(1).  According to the United States, as an employee-leasing company, Mainstay is liable for FUTA payments as the statutory employer of the LEs, but its liability must be determined and calculated by reference to the LEs' common law employers -- the customers of Mainstay for whom the LEs purportedly performed their services.  <u>Id.</u>  Because its

11

customers were not tribal entities,[9] the tribal exception to the definition of "employment," found in § 3306(c)(7), should not apply.  Id.  Mainstay contends that the § 3306(c)(7) exception applies even if it is merely the statutory employer of the LEs, and that, in any event, it is also the common law co-employer of the LEs.  Pls.' MSJ at 20-24.

### A.   How the Tribal Exception Operates

The Court begins its analysis with the language and structure of FUTA.  FUTA liability depends upon a circuit of overlapping definitions, and it is necessary to examine each term in order to understand how the tribal exception operates.  As previously noted, FUTA imposes "on every employer . . . for each calendar year an excise tax, with respect to having individuals in his employ, equal to . . . 6.2 percent . . . of the total wages . . . ."  26 U.S.C. § 3301.  The tribal exception states that "services performed . . . in the employ of an Indian tribe" is not considered "employment." Id. § 3306(c)(7).  The tribal exception is therefore an exception to the definition of "employment."  Notably, FUTA's liability provision, § 3301, does not directly use the term "employment." However, FUTA's liability provision does expressly use the terms "employer" and "wages," id. § 3301, and both of these terms do incorporate the statutory definition of "employment."  Id. §§ 3306(a)-(b).  In most situations, the tribal exception therefore operates by eliminating the statutory "employer" as well as statutory "wages."

To reiterate, the tribal exception does not specifically state

---

[9] Plaintiffs have submitted no evidence regarding the identities of its clients, and has never suggested that its clients were eligible for any exemption under FUTA.

12

that Indian tribes are exempt from FUTA liability -- rather, it states that "services performed . . . in the employ of an Indian tribe" is not considered "employment" for the purposes of construing FUTA. Id. § 3306(c)(7). Generally, FUTA borrows the concept of "employment" from the common law. In most employment situations, where none of the twenty-one different exceptions to "employment" found in § 3306(c) apply,[10] "employment" exists whenever services are performed "by an employee for the person employing him." Id. § 3306(c). To determine whether services are provided by an "employee," FUTA borrows the definition of "employee" from FICA, § 3121(d), which includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." Id. §§ 3121(d)(2), 3306(i). The tribal exception therefore normally operates by eliminating the existence of statutory "employment" where services performed in a common law relationship between an employer and employee would normally lead to the existence of "employment."[11]

As noted above, the definition of "employment" is critical to the creation of FUTA liability in two different ways. The first way that "employment" is used by FUTA is to define "wages." FUTA imposes liability upon employers based upon the "total wages" paid to individuals in its employ. Id. § 3301. Wages are defined as

---

[10] Examples of other exemptions include agricultural labor, domestic service, service performed in the employ of one's son, daughter or spouse, and service performed in the employ of a religious, charitable, or educational institution. See 26 U.S.C. § 3306(c).
[11] FICA does create several additional categories of "employee," 26 U.S.C. § 3121(d), however no party has argued that any of these categories are relevant to this dispute.

"all remuneration for employment," up to the first $7000 of remuneration. Id. § 3306(b). Therefore if there is no "employment," there can be no "wages" and there will be no basis for FUTA liability. This is one way that an exception to the definition of "employment" -- such as the exclusion of services provided to a tribal body -- can result in an exception to liability under FUTA.

The second way that "employment" is used by FUTA is to define "employer." An "employer" is anyone who (A) during a calendar quarter, pays wages of at least $1500, or who (B) employed at least one individual "in employment" on at least twenty days during a calendar year or preceding calendar year, each day being on a different calendar week. Id. § 3306(a). Under the first prong, in the absence of "employment" there will be no wages, and therefore no "employer." Under the second prong, no individual would be employed "in employment," and thus there would be no "employer." An exception to "employment" -- such as the exclusion of services provided to a tribal body -- can therefore render FUTA inoperative by eliminating the existence of a statutory "employer."[12]

The Court makes two observations based upon the textual analysis of FUTA and its tribal exception. First, it is clear that the exceptions to FUTA liability, including the tribal exception,

---

[12] The Court notes that this statutory definition of "employer" was added in 1970. See Employment Security Amendments of 1970, 91 Pub. L. No. 373, 84 Stat. 695 (1970). The purpose of this amendment was apparently "to narrow the scope of the 'small employer' exception to the FUTA definition of 'employer,'" which certain taxpayers were apparently abusing to avoid FUTA liability. See Cencast Servs., L.P. v. United States, 62 Fed. Cl. 159, 162 (Fed. Cl. 2004) (discussing history and implications of FUTA's definition of "employer"). The Court notes that the role of FUTA's definition of "employer" has been limited, at least in the calculation of FUTA liability. See id.

operate by removing both statutorily defined "wages" and "employer" from an otherwise normal employment relationship.  Consequently, if the situation of a particular taxpayer requires that other provisions of the IRC control the determination of whether an "employer" or "wages" exist, this will obviously raise questions about how or whether the exceptions should apply.  As this Order discusses below, Mainstay's relationship with its LEs requires this Court to examine other provisions to resolve its FUTA liability.

Second, the text and structure of FUTA generally premises FUTA liability upon the existence of common law employment relationships -- i.e., if there is no "employee," §§ 3121(d), 3306(i), and therefore no "employment," § 3306(c), and therefore no "wages," § 3306(b), or "employer," § 3306(a), both of which are required by the general liability provision of § 3301.  This textual reading is consistent with the IRS' historical interpretation of FUTA.  The IRS has long focused on the common law employer as the relevant employer for assessing FUTA liability, even where other entities are responsible for paying the wages of employees.  The United States cites a number of rulings that show that the common law employer has historically been the proper employer for imposing FUTA and FICA liability, even though a third party is actually responsible for paying the employees in question.  See, e.g., Rev. Rul. 57-145, 1957-1 C.B. 332 (1957); Rev. Rul. 57-316, 1957-2 C.B. 626 (1957); see also S.S.T. 154, 1937-1 C.B. 391 (1937) (Treasury ruling stating that, where employee performs work for subsidiary but is paid by parent company, "the subsidiary for which the services are performed is considered the employer"); Rev. Rul. 69-

316, 1969-1 C.B. 263 (1969) (same).[13]

**B.    The Role of Statutory Employers**

One should not conclude from the above discussion that a typical employee-leasing company, having no common law employment relationship with its LEs, faces no FUTA liability.  Although it is not apparent on the face of FUTA, there is another way that an entity can assume liability as an "employer," which is well supported by case law.  The portion of the IRC that governs the withholding of income taxes, 26 U.S.C. §§ 3401 et seq., also addresses the concept of a "statutory employer."  Section 3401(d) first defines "employer" in accordance with the common law definition of employer, i.e., "the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person."  26 U.S.C. § 3401(d).  However, the provision goes on to state that, "if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term 'employer' . . . means the person having control of the payment of such wages," except for the purpose of determining "wages" under § 3401(a).  Id. § 3401(d)(1).  This provision "establishes that the statutory employer, having control of the payment of wages, is responsible for withholding, paying and reporting employees' federal income taxes."  See Cencast Servs., L.P. v. United States, 62 Fed. Cl. 159, 162 (Fed. Cl. 2004).

An entity that is not a common law employer can therefore become an "employer" for withholding purposes if the entity is the

---

[13] A thorough discussion and analysis of these same rulings appears in the decision issued by the Court of Federal Claims in Cencast Servs., 62 Fed. Cl. 159.

16

"statutory employer," i.e., the one who pays the wages for work performed for a separate common law employer. In Otte v. United States, the Supreme Court determined that statutory employers under § 3401(d)(1) are also employers for the purpose of the Federal Insurance Contribution Act ("FICA"), 26 U.S.C. § 3101 et seq. 419 U.S. 43 (1974). Other courts have since interpreted FUTA to require statutory employers to pay FUTA taxes, even though they may not be the common law employers of their employees. See, e.g., Consol. Flooring Servs. v. United States, 42 Fed. Cl. 878, 879 (Fed. Cl. 1999) ("Courts have uniformly interpreted Otte to mean that § 3401(d)(1) employers are liable for . . . paying FUTA taxes . . . ."); see also In re Armadillo Corp., 561 F.2d 1382, 1386 (10th Cir. 1977); In re Laub Baking Co., 642 F.2d 196 (6th Cir. 1981). The position of the United States depends upon Mainstay's admitted status as a statutory employer,[14] since it is arguing that Mainstay is liable as a statutory employer of the LEs, even though it is not their common law employer.

### C. How the Tribal Exception Operates with Regard to a Statutory Employer

The Court now turns to the question of how the exceptions to the definition of "employment" found in § 3306(c), and the tribal exception of § 3306(c)(7) in particular, operate for §3401(d)(1) statutory employers. In other words, should a statutory employer be liable under FUTA where an employee performs services that would be considered "employment" if "employment" is defined by reference to the common law employer, but would not be considered

---

[14] Plaintiffs plead that Mainstay is a § 3401(d)(1) employer. See Compl. ¶ 22.

"employment" if that term is defined by reference to the statutory employer? The Court concludes "employment" must be defined by reference to the common law employer, and that the statutory employer must be liable.

First, the Court notes that the statutory employer is an "employer" for FUTA purposes, no matter which employer is used to determine "employment" or evaluate the § 3306(c) exceptions. This is because § 3401(d), unlike § 3306(a), defines "employer" without reference to "employment." Under <u>Otte</u> and its progeny, a statutory employer defined by § 3401(d) is an "employer" for FUTA purposes, and this status is not dependent upon the existence of a common law relationship. <u>Consol. Flooring</u>, 42 Fed. Cl. at 879; <u>see also</u> 3401(d). The Court sees no reason to read into the text of § 3401(d) the requirement that a statutory employer have an "employment" relationship as defined by § 3306(c). Therefore, even in the absence of "employment" under § 3306(c), a statutory employer is an "employer" for FUTA purposes. The tribal exception clearly cannot preclude the existence of a statutory "employer" under FUTA.

The next question is which employer is relevant to defining "employment" for the purpose of establishing whether "wages" exist. As previously noted, <u>see</u> Part IV.A, <u>supra</u>, before <u>Otte</u>, the IRS considered the common law employer to be the relevant employer. A revenue ruling from 1954 presented a question very similar to the question now before the Court. <u>See</u> Rev. Rul. 54-471, 1954-2 C.B. 348 (1954). This ruling might be characterized as the mirror image of the situation presented by Mainstay. The ruling involved FUTA and FICA liability for demonstrators who were paid by a nonexempt

18

third-party agency, but who provided short-term services for a
state-owned citrus commission, which was an exempt entity under the
precursor for the modern § 3306(c)(7). The IRS found that the
state was the common law employer of the demonstrators, even though
the nonexempt third-party agency was responsible for reimbursing
the demonstrators. Based on this, the IRS concluded that "the
common law relationship of employer and employee existed between
the [state citrus] commission and the demonstrators and their
services are excepted from 'employment.'" Id. In other words, the
existence of a common law employment relationship between the
demonstrators and the state was sufficient to trigger the exception
to the definition of "employment."

Since Otte was decided, it is clear that the common law
employer continues to be the relevant employer for defining and
calculating "wages," even where a statutory employer is present.
Section 3401(d)(1) specifically states that the statutory employer
is not considered the "employer" for the purposes of subsection
3401(a), which sets out a definition of "wages" for withholding
purposes and is similar to the definition for "wages" set out by
FUTA, § 3306(b). Similarly, a recent decision issued by the Court
of Federal Claims reflects that statutory employers must look to
the common law relationship that exists between the employees and
their common law employers to calculate "wages" in determining
their FUTA liability. In Cencast Services, L.P., v. United States,
the Court of Federal Claims concluded that an employee-leasing
company, Cencast, which was liable for FUTA payments as the
statutory employer of its LEs, had to calculate its liability based
on the "wages" paid on behalf of the LEs' common law employers

19

(i.e., Cencast's customers, the companies to whom Cencast leased the services of its LEs, and to whom the LEs provided services). 62 Fed. Cl. at 183-84. Since FUTA imposes on each employer a duty to pay unemployment taxes that are calculated based only on the first $7000 of wages paid to each employee, see 26 U.S.C. §§ 3301, 3306(b)(1), this ruling required Cencast to calculate its liability as a percentage of the first $7000 paid to each LE by each of the LE's common law employers.[15] In short, it is the common law employer, and not the statutory employer, that matters when calculating wages under FUTA.

Although Cencast does not specifically address the issue of whether a statutory or common law employer is the relevant employer for applying the § 3306(c) exceptions, it does confirm that the common law employer is the relevant employer for determining "wages" under § 3306(b). The § 3306(c) exceptions are relevant to the assignment of FUTA liability in large part because of the role that "employment" plays in defining "wages." See Part IV.A, supra. The only reasonable and consistent conclusion is to read the definition of "wages" as turning on the existence of "employment" with reference to the common law employer, and not the statutory employer.

Plaintiffs point out that the language of the exception refers to services performed "in the employ" of a tribal body, instead of services "by an employee" of a tribal body. They argue that the

---

[15] For example, if an LE had three common law employers during a calendar year, and the LE was paid more than $7000 for services provided to each common law employer, then Cencast would be required to pay FUTA taxes based on $21,000 of that LE's wages. However, if "wages" were calculated based solely upon the LE's relationship with Cencast, the statutory employer, Cencast would only be liable based on the first $7000 of remuneration.

1  Court should consider the services of the LEs to be services "in

2  the employ" of Mainstay, irrespective of the existence of any

3  common law employment relationship.  Pls.' MSJ at 14-18.

4  Plaintiffs rely upon Independent Petroleum Corp. v. Fly, in which a

5  panel for the Fifth Circuit based its decision in large part upon

6  Congress's use of the phrase "in his employ" in the social security

7  tax scheme, instead of "employee."  141 F.2d 189, 190, (5th Cir.

8  1944).

9      The Court disagrees with Plaintiffs' reading of the phrase "in

10  the employ of . . . ."  FUTA never defines this phrase.  Plaintiffs

11  have not presented a compelling basis for concluding that A should

12  be considered "in the employ" of B, simply because A receives

13  remuneration from B for services that A performed for C

14  (particularly where C reimburses B in full).  In this scenario, B

15  is a middleman, and not an "employer" in any meaningful sense

16  besides the special sense established by § 3401(d)(1).  B does not

17  directly receive the services of A, though B may benefit from A's

18  services just as any vendor receives a benefit from the products

19  that it sells.  In addition, the most natural reading of this

20  phrase does suggest that it relates to the common law employer --

21  FUTA textually and historically relies upon the existence of a

22  common law employment relationship to hold an employer liable, and

23  it therefore generally holds an employer liable for "individuals in

24  his employ" where those individuals are his common law employees.

25  See Part IV.A, supra.  Even though Independent Petroleum suggests

26  that the phrase "in the employ" may be broader than the term

27  "employee," it does not suggest that the phrase extends beyond

28  common law employment relationships.  141 F.2d 191.  Instead, the

**United States District Court**
For the Northern District of California

Fifth Circuit used that language to support its conclusion that an officer who effectively performed no duties and received nothing of value from the company was not "in the employ" of that company. Id. ("Nominal officers such as honorary Vice-presidents and this Secretary, who do nothing and are paid nothing, were not intended to be made into employees throughout the Act.").

Plaintiffs also point out that FUTA imposes liability "with respect to having individuals in his employ," § 3301, and argue that this must be read to have the same meaning as "in the employ," as used by § 3306(c)(7). Pls.' MSJ at 15-16. "Thus, if individuals are paid wages 'in the employ' of Mainstay for purposes of establishing FUTA tax liability under Section 3301, those same individuals should be considered as serving 'in the employ' of Mainstay for purposes of the exemption." Id.

This Court agrees that, where an employer is an employer solely by virtue of his statutory relationship with an individual (i.e., a § 3401(d)(1) employer), that individual is clearly "in his employ" for the purpose of establishing liability under § 3301. See Consol. Flooring, 42 Fed. Cl. at 879. However, the Court believes that this is a departure from the general rule that an individual will be "in his employ" where a common law employment relationship exists. This departure is brought about by Otte and its progeny, and may be applied narrowly. The Court concludes that the language and structure of FUTA and related IRC provisions require the normal reading of "in the employ" under § 3306(c), even where the special reading of "in his employ" under § 3301 is mandated by the statutory employer context. "Although we generally presume that identical words used in different parts of the same

22

act are intended to have the same meaning, the presumption is not rigid and the meaning of the same words well may vary to meet the purposes of the law." <u>United States v. Cleveland Indians Baseball</u>, 532 U.S. 200, 213) (2001) (quoting <u>Atlantic Cleaners & Dyers, Inc.</u> <u>v. United States</u>, 286 U.S. 427, 433 (1932)) (internal quotation marks and brackets omitted). In § 3306(c)(7), "in the employ" is read primarily for the purpose of establishing whether the remuneration paid to that individual can be considered "wages" under FUTA, and "wage" determinations must be made with respect to the common law employer. In addition, this reading preserves the primacy of the common law employment relationship in evaluating FUTA liability, which predates <u>Otte</u> and continues to operate for the purpose of calculating employer liability.

The Court also recognizes that Plaintiffs' reading of the statute would allow non-tribal employers to easily obtain the tax advantages that Congress has created for tribal bodies (or, for that matter, for other entities exempted under § 3306(c)). Every time a nonexempt employer retained the services of an exempted employee leasing company, the federal and state unemployment tax liability of the employer would change significantly, even though the fundamental relationship between the employee and the client common law employer would not necessarily be disturbed. This would create a theoretically limitless potential for abuse. Congress could not have intended its carefully crafted exceptions to FUTA liability to be susceptible to such expansion. Plaintiffs' reading of the tribal exemption would allow for practices that go well beyond Congress's clear goal of providing assistance to tribal bodies by putting them on the same ground as state governmental

1   bodies.  The United States' reading of the provision avoids this

2   potential for abuse.

3        This Court finds that the exception to the definition of

4   "employment" for "services performed . . . in the employ of an

5   Indian tribe, or any instrumentality" thereof, § 3306(c)(7), is

6   only available when an Indian tribe is the common law employer of

7   the employees in question.  When an Indian tribe is merely the

8   statutory employer, the applicability of this exception depends

9   upon the employee's relationship with his or her common law

10  employer.  Where the common law employer is not an Indian tribe,

11  and where no other exemption under § 3306(c) applies, the statutory

12  employer will be liable under FUTA.

13        **D.**   **Whether Mainstay is the Common Law Employer of the LEs**

14        Plaintiffs contend that they are exempt because Mainstay is

15  the common law co-employer of its LEs.  Pls.' MSJ at 20-23.

16  Plaintiff argues that "an individual may be the common law employee

17  of both a staffing agency and its customer."  Id. at 21 (citing

18  Vizcaino v. U.S. Dist. Court for the W. Dist. of Washington, 173

19  F.3d 713, 723-25 (9th Cir. 1999).[16]  The United States responds by

20  claiming that the facts that Plaintiffs have presented to describe

21  Mainstay's relationship with its LEs are legally insufficient to

22  establish a common law employment relationship.  US Opp'n at 4-5.[17]

23  _____

24  [16] The Court assumes that it is possible for an employee to have
    more than one common law employer for FUTA purposes.  The United
25  States argues that such an outcome "raises the issue of which
    entity's status is controlling for tax purposes. . . .  The
26  question could be equally relevant for each of the twenty-one
    section 3306(c) exceptions, as well as comparable social security
27  and income tax withholding equivalents."  US Opp'n at 19 n.6.
    [17] The United States bases its arguments on the declarations
28  submitted by Plaintiffs, and also upon the declarations submitted
    in support of the US MSJ by Internal Revenue Agents Green and Larry

The existence of a common law employment relationship depends upon a variety of factors:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989) (citations and footnotes omitted). Relevant IRS regulations cite a similar list of factors, stating that an employment relationship generally exists:

> when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer

---

K. Lauer. Docket Nos. 27, 39. Plaintiffs have objected to both of these declarations, and argue that the agents fail to establish a basis for their personal knowledge of the facts presented, and that the Lauer Declaration and attached exhibits also contain inadmissible hearsay. Docket Nos. 43, 47. The United States has not responded to either objection. The Court finds that Plaintiffs have themselves sufficiently described the operation of Mainstay, such that reference to both declarations, and the majority of their attached exhibits, is unnecessary for the resolution of these Motions. The Court therefore assumes, arguendo, that the objections are well founded and resolves them in Plaintiffs' favor. The objections are SUSTAINED and the relevant portions of each declaration and their attached exhibits are STRICKEN. The sole exception is the printout of the Blue Lake Rancheria Website, which the Court has already addressed in footnote 4, supra.

not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services.

26 C.F.R. § 31.3306(i)-1(b).

The authority cited by both parties demonstrates that "the hiring party's right to control the manner and means" of the employee's services is a very important consideration in determining the existence of a common law employment relationship. See id.; Creative Non-Violence, 490 U.S. at 751. Both parties rely heavily upon Revenue Ruling 87-41, 1987-1 C.B. 296 (1987), which specifically addresses the question of whether an individual is a common law employee of a firm that sells the services of that individual to its clients. It offers a list of factors for consideration, as well as three hypothetical test cases. Id. Notably, it resolves each test case on the basis of whether the hiring firm "retain[s] any right to control the performance of the services" of the employee. Although it is true that no one factor is determinative, Creative Non-Violence, 490 U.S. at 751, the Court finds it notable that the IRS afforded this factor so much weight. This factor is particularly well suited for determining the nature of an employment relationship in the context of a company that leases or sells the services of individuals to its clients.

Plaintiffs have not provided any evidence that suggests that Mainstay possessed "the right to control the manner and means by

which the product is accomplished." C.f. Cmty. for Creative Non-Violence v. Reid, 490 U.S. at 751.  Instead, all evidence submitted by Plaintiffs suggests that the employees' "daily work activity would be directed by supervisors at the worksite."  Sparks Decl. ¶ 4.  The Employee Handbook states that "[y]our day-to-day job duties, hours, and activities will be directed and supervised by management at your worksite company," Employee Handbook at 5, and the Management Guide confirms that "[a]lthough Mainstay will be integrated into areas involving employee services, your employees still work for your company and you still direct their day-to-day activities in the workplaces," Management Guide at 4.

The fact that "the "clients' on-site supervisors were also Mainstay employees" is irrelevant.  See Pls.' MSJ at 22-23.  These supervisors were "hired by Mainstay at the same time the employees were hired by Mainstay."  Sparks Decl. ¶ 12.  Plaintiffs never suggest that Mainstay had any degree of control over the details and means of the supervisors' service.  Unless Plaintiffs can provide a basis for concluding that a common law employment relationship existed between the supervisors and Mainstay, the fact that Mainstay had a statutory employment relationship with these supervisors is of no significance to the question of whether Mainstay had the right to direct the means and details of the LEs' services.  Plaintiffs may not cobble together a common law employment relationship from two statutory employment relationships.

Plaintiffs' brief does include a vague factual assertion that may be construed as a claim that Mainstay retained a right to control the services provided by the LEs: "Mainstay provides

significant continuing oversight and direction concerning the
overall employment relationship and management of the employees and
direction concerning the overall employment relationship and
management of the employees . . . ." Pls.' SJM at 22. To the
extent that this factual assertion claims "the right to control the
manner and means by which the product is accomplished," it is
unsupported by Plaintiffs' affidavits. Plaintiffs allege various
rights, such as input in the termination and hiring process,
possession of personnel records, and control over benefits, but
none of this amounts to supervision as to the means or details of
service.

Similarly, Plaintiffs establish that Mainstay retained limited
oversight over general aspects of the LEs' relationships with their
workplaces, such as the investigation of harassment claims,
discipline, and termination; Mainstay also required its clients to
"comply with its direction and guidance to manage risks and promote
employee safety." See Hansen Decl. §§ 7-8; see also Sparks Decl.
¶ 10 (describing "policies devoted to maintaining a safe and
healthy working environment"). The Court finds that such general
oversight rights, which exist for all types of employment and do
not relate to the details of any particular job, do not suffice to
give Mainstay the "the right to control and direct the individual
who performs the services, not only as to the result to be
accomplished by the work but also as to the details and means by
which that result is accomplished." 26 C.F.R. § 31.3306(i)-1(b).
Instead, all evidence submitted by Plaintiffs suggests that the
rights and duties at the "details and means" level of employment
remained solely the province of Mainstay's clients. The Court

finds that Mainstay has therefore failed to establish this important aspect of the employment relationship.

Plaintiffs point to several other factors to support the existence of a common law employment relationship, such as the fact that Mainstay controls the pay and benefits of the LEs (and pays the LEs even if its clients fail to reimburse Mainstay). Hansen Decl. ¶¶ 5, 14. It furnished the LEs with insurance. Hansen Decl. ¶ 5. Mainstay directed its clients to undergo safety training and risk management, and handled harassment complaints. Id. ¶ 6. It also handled certain tax and employment liabilities. Id. ¶ 12. It made sure that the LEs "understood" that Mainstay was its employer, and required them to sign an agreement to that effect. Sparks Decl. ¶ 5. Mainstay's Employee Handbook set out guidelines for a wide variety of policies including absenteeism, harassment, computer and email usage, appearance, and smoking. See Employee Handbook at 11-21. Most significantly, Mainstay maintained the right to hire and fire employees, Hansen Decl. ¶ 5; Sparks Decl. ¶ 6, which is "also an important factor indicating that the person possessing that right is an employer," 26 C.F.R. § 31.3306(i)-1(b).[18]

The Court finds that the facts established by Plaintiffs, even when construed in the light most favorable to Plaintiffs, are

---

[18] The United States contends that Mainstay's "right to discharge worksite employees is illusory." US Opp'n at 21. Although the extent to which Mainstay exercised its right to hire and fire appears to be in dispute, it is undisputed that it possessed such rights. See Standard Customer Agreements. The Court finds that any dispute regarding Mainstay's actual use of such rights is immaterial, since even if this Court assumes that Mainstay's rights were substantial and regularly utilized, these rights would be insufficient to support a common law employment relationship in this context.

legally insufficient to support the existence of a common law employment relationship between Mainstay and its LEs. The Court is mindful that Mainstay is a 3401(d)(1) employer that operates by hiring its clients' employees as its own, Hansen Decl. ¶ 2, and did not fundamentally affect the day-to-day provision of services that these employees provided. Mainstay is in the business of assuming duties related to pay, benefits, and human resource supervision, as described above, and of leasing its employees services to its clients -- its relationship to its LEs is not dependent upon the nature of the services that they provide. Even assuming that Mainstay accepts a more robust set of duties and rights than most employee-leasing agencies, the Court finds that it has failed to establish that its role is that of a common law employer.

**E.    The Significance of the ALJ Order**

Plaintiffs contend that "[t]he dual federal-state system created by the 2000 FUTA amendments gives state unemployment administrators a significant role in determining whether Tribes qualify for exemption from FUTA tax and treatment as reimbursing employers." Pls.' MSJ at 18. This Court recognizes that the results of its decision may be construed as inconsistent with the decision issued by the ALJ. See ALJ Order at 6-7. However, the ALJ's decision did not purport to interpret § 3306(c)(7). Nor did the ALJ consider the question of whether Mainstay was the common law employer of its LEs. Instead, it was based primarily upon section 606.5 of the CUIC. See id. Under this provision, an employee of a temporary staffing agency is considered the employee of that agency for the purposes of the CUIC, even though the employee's work was performed for the agency's client, regardless

of "the common law rules applicable in determining the employer-employee relationship . . . ." CUIC § 606.5(a), (c). Based on this provision, the ALJ concluded that Mainstay's employees were providing "services for" Mainstay. Id.

This Court cannot restrict its interpretation of FUTA by incorporating the unemployment code provisions of any particular state. Section 606.5 of the CUIC, which is similar to § 3401(d), did not require the ALJ to consider the common law employer of Mainstay's LEs for the purpose of determining the existence of "wages." As previously discussed, the exceptions to the definition of employment in FUTA operate by nullifying the existence of "wages," §§ 3306(b)-(c), which focus on the common law employer, and Mainstay is made a statutory "employer" by § 3401(d)(1) irrespective of the tribal exception of the definition of "employment."

Although it is possible that this ruling may have implications for the operation of state law, those questions are not now before this Court. Plaintiffs claim that this result will "inequitably require Mainstay to grossly overpay its unemployment tax liabilities. . . . These amounts would be a windfall for the federal government, and would not be shared with the State of California to help fund federally mandated extensions of unemployment benefits or for other purposes." Pls.' MSJ at 20. However, the ALJ's ruling did not require Mainstay to meet its state unemployment tax burden through the reimbursement method -- it could have opted to pay state unemployment taxes as a regular nontribal employer. 26 U.S.C. § 3309(2). Plaintiffs have not demonstrated to this Court why Mainstay will be put in a worse

position by this Order than any other entity that may not avail itself of the exceptions of § 3306(c)(7).

## V.   __CONCLUSION__

The Court concludes that the tribal exception to "employment" of § 3306(c)(7) is only available to an Indian tribe where that Indian tribe is the common law employer of the individual in question.  The Court also finds that the undisputed material facts presented by Mainstay are legally insufficient to establish that Mainstay is the common law employer of the employees in question in this suit.  The Court hereby GRANTS the United States' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment.

IT IS SO ORDERED.


Dated: January 7, 2010

_____
UNITED STATES DISTRICT JUDGE